**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Center for Special Needs Trust | ) | **ORDER REGARDING MOTIONS** |
| Administration, Inc., | ) | **FOR SUMMARY JUDGMENT** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 1:09-cv-072 |
| Carol K. Olson, in her official capacity as | ) | |
| Executive Director of North Dakota | ) | |
| Department of Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

_____

Before the Court are the Defendant's and the Plaintiff's motions for summary judgment filed on April 5, 2010 and May 4, 2010, respectively.  See Docket Nos. 10 and 13.  On May 4, 2010, the Plaintiff filed a response in opposition to the Defendant's motion.  See Docket No. 14.  The Defendant filed a reply brief on May 18, 2010.  See Docket No. 16.  On May 25, 2010, the Defendant filed a response in opposition to the Plaintiff's motion.  See Docket No. 17.  The Plaintiff filed a reply brief on June 4, 2010.  See Docket No. 18.

I.      **BACKGROUND**

The Medicaid program, 42 U.S.C. §§ 1396-1396v, was created in 1965 and is designed to furnish medical assistance to persons "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396.  The federal Medicaid program authorizes grants to the states to help fund medical assistance programs and specifies requirements for the administration of the state programs.  Medicaid eligibility is determined by a needs-based analysis and coverage is denied if the applicant exceeds a ceiling in countable assets.

Prior to 1993, individuals had many techniques to transfer their property into trust to qualify for Medicaid. The Omnibus Budget Reconciliation Act of 1993 (OBRA) created a transfer penalty system in the Medicaid program. Many of the transfer techniques used before OBRA now generate transfer penalties, resulting in a period of time where the individual would be ineligible for Medicaid. However, certain exemptions from the transfer penalty system exist. One such exemption is commonly referred to as a "pooled trust" described in 42 U.S.C. § 1396p(d)(4)(C), in which an individual can transfer his or her own funds into a trust which allows the income and assets of a number of persons with disabilities to be managed by a nonprofit organization. Pursuant to 42 U.S.C. § 1396p(d)(4)(C), a pooled trust is one that contains the assets of an individual who is disabled and meets the following conditions:

> (i) The trust is established and managed by a nonprofit association.
>
> (ii) A separate account is maintained for each beneficiary of the trust, but, for purposes of investment and management of funds, the trust pools these accounts.
>
> (iii) Accounts in the trust are established solely for the benefit of individuals who are disabled (as defined in section 1382c(a)(3)[1] of this title) by the parent, grandparent, or legal guardian of such individuals, by such individuals, or by a court.
>
> (iv) To the extent that amounts remaining in the beneficiary's account upon the death of the beneficiary are not retained by the trust, the trust pays to the State from such remaining amounts in the account an amount equal to the total amount of medical assistance paid on behalf of the beneficiary under the State plan under this subchapter.

The defendant, the North Dakota Department of Human Services ("NDDHS"), through Carol K. Olson in her official capacity as executive director, is the state agency responsible in North

---

[1] "[A]n individual shall be considered to be disabled for purposes of this subchapter if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

2

Dakota for implementation of the Medicaid program.  The plaintiff, Center for Special Needs Trust Administration, Inc. ("Center") is a nonprofit corporation organized under the laws of Florida with its principal place of business in Clearwater, Florida.

On February 5, 2002, Center made a declaration of trust, establishing a pooled trust pursuant to 42 U.S.C. § 1396p, to which Center is the trustee.  <u>See</u> Docket No. 1-1.  Article 6 of the declaration of trust states:

ARTICLE 6
DISTRIBUTIONS AT THE BENEFICIARY'S DEATH

Upon the death of a Beneficiary, any amounts that remain in the Beneficiary's Trust sub-account shall be administered so as to conform with all of the requirements of 42 U.S.C. §1396p and/or related statutes, including state statutes and regulations that are consistent with the provisions and purposes of the Omnibus Budget Reconciliation Act of 1993, amending 42 U.S.C. § 1396p and pertaining to reimbursement to the States for government assistance provided on behalf of the individual Beneficiary.

Such property shall be distributed to each state in which the Beneficiary received government assistance, based on each state's proportionate share of the total government assistance paid by all of the states on the Beneficiary's behalf, to the extent that any such property is not retained by the Trust.  In the Trustee's sole discretion as to specific use, any amounts retained in the Trust shall be used in accord with the following provisions:

   a)      for the direct or indirect benefit of other Beneficiaries;

   b)      to add disabled persons, as defined in 42 U.S.C. § 1382c(a)(3), who are indigent to the Trust as Beneficiaries; or,

   c)      to provide disabled persons, as defined in 42 U.S.C. § 1382c(a)(3), with equipment, medication, or services deemed suitable for such persons by the Trustee.

<u>See</u> Docket No. 1-1, p. 6.

3

On November 30, 2007, Allen Kemmet entered into a National Pooled Trust Joinder Agreement, adopting Center's declaration of trust, and transferred $54,450 to Center for deposit into the National Pooled Trust.  Article III of the joinder agreement states:

Article III
Distributions Upon the Beneficiary's Death

Any assets that remain in the Beneficiary's separate Trust sub-account at the Beneficiary's death shall be treated in accordance with the provisions below.

3.01    Assets in Trust.   If any assets remain in the Beneficiary's separate Trust sub-account at the Beneficiary's death, such assets shall be deemed surplus Trust property and shall be retained by the Trust pursuant to all of the relevant and applicable provisions of 42 U.S.C. § 1396p, including all related statutes, regulations, and/or rules.

3.02    Use of Retained Assets.  In the Trustee's sole and absolute discretion, retained surplus Trust property shall be used:

a)  for the direct or indirect benefit of other Beneficiaries;

b)  to add disabled persons, as defined in 42 U.S.C. § 1382c(a)(3), who are indigent to the Trust as Beneficiaries; or,

c) to provide disabled persons, as defined in 42 U.S.C. § 1382c(a)(3), with equipment, medication, or such other services deemed suitable for such persons by the Trustee.

Subject to all provisions herein, gifts or devises to the Trust shall be similarly treated unless a specific purpose is specified by the donor.  To the extent that any surplus Trust property is not retained by the Trust pursuant to paragraph 3.01 above, such property shall be distributed to each State in which the Beneficiary received government assistance, based on each State's proportionate share of the total government assistance paid by all of the States on the Beneficiary's behalf.  For all such purposes hereunder, the Trustee and all States where the Beneficiary received government assistance are clearly identifiable residual beneficiaries and have standing to challenge any attempt by the Beneficiary or any other party to revoke this irrevocable Agreement.

See Docket No. 1-1, p. 16.  Kemmet became both the grantor and the beneficiary.  At the time, Kemmet was 78-years old and living in the Missouri Slope Lutheran Care Center, a licensed nursing facility in Bismarck, North Dakota.

On January 22, 2008, the Burleigh County Social Service Board ("Burleigh County"), which acts under the direction and supervision of NDDHS to administer the Medicaid program, received a letter from Kemmet's attorney, Damian Huettl.  See Docket No. 12-2.  The letter enclosed Kemmet's Medicaid application, which included a copy of the February 5, 2002 declaration of trust and the agreement executed by Kemmet on November 30, 2007.  Huettl claimed that Kemmet met the Medicaid eligibility requirements and was eligible for coverage by Medicaid for skilled nursing care.  A Burleigh County staff member sent the documents submitted by Huettl to NDDHS for review.  Annette Bendish, an attorney with the NDDHS's Legal Advisory Unit, mistakenly identified Kemmet's age to be 54-years old.  Bendish directed Burleigh County to determine Kemmet's eligibility without counting the money he placed in the trust and to not consider his transfer to the trust as disqualifying Kemmet from receiving Medicaid coverage for his nursing facility care.  See Docket No. 12-3.  Burleigh County determined that Kemmet was eligible for Medicaid coverage effective March 1, 2008.  Kemmet received Medicaid benefits from March 1, 2008 until his death on October 8, 2008, at a total cost to the Medicaid program of $41,135.19.

After Kemmet's death, NDDHS determined that Kemmet was not eligible for Medicaid, contending that his payment of $54,450 to Center was a transfer of an asset that caused him to be ineligible for Medicaid coverage for his nursing facility care pursuant to 42 U.S.C. § 1396p(c), N.D.C.C. § 50-24.1-02(1), and N.D. Admin. Code § 75-02-02.1-33.2.  On October 23, 2008, NDDHS sent Center a letter that requested reimbursement for the amount of services provided to

Kemmet.  See Docket No. 12-4.  NDDHS sent a follow-up letter on April 1, 2009.  See Docket No. 12-5.  On June 9, 2009, Gregory Larson, the attorney of record for Center, sent NDDHS a letter that disputed any money was owed.  See Docket No. 12-6.

On November 2, 2009, Center brought an action in federal district court, requesting the Court enter (1) a declaratory judgment that NDDHS has violated federal law by demanding payment from Center from the retained monies and that those provisions of the North Dakota Administrative Code that conflict with federal law regarding pooled trusts are invalid; (2) a preliminary and permanent injunction ordering NDDHS to cease demanding payment from pooled trusts at the death of a pooled trust beneficiary; (3) a preliminary and permanent injunction ordering NDDHS to make no future similar demands against Center; and (4) awarding Center its costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988.  See Docket No. 1.  Both parties filed motions for summary judgment.

On November 4, 2009, NDDHS brought an action in state district court against Center and Damian Huettl.  See Case No. 1:09-cv-077, Docket No. 1-1.[2]  On November 23, 2009, Center removed the state action to federal district court.  See Case No. 1:09-cv-077, Docket No. 1.  NDDHS filed a motion to remand on December 24, 2009, which was granted on January 6, 2011.  See Case No. 1:09-cv-077, Docket Nos. 8 and 23.

---

[2] The state court action brought by the North Dakota Department of Human Services alleges claims of fraud on creditors and wrongful conversion which, under the circumstances, seems to be overreaching at best.  The record reveals that this dispute occurred as a direct result of an innocent mistake on the part of the NDDHS legal staff, not fraud, misrepresentation, or wrongful conversion on the part of anyone.  In addition, the Court notes that the amount in dispute has been revised to $19,234.58 rather than the $40,000+ originally claimed.  See Docket No. 12-11.  In essence, this is a simple collection dispute to recover approximately $19,000.

## II.    **LEGAL DISCUSSION**

"The Medicaid Act is a federal aid program designed to help the states provide medical assistance to financially-needy individuals, with the assistance of federal funding." Lankford v. Sherman, 451 F.3d 496, 504 (8th Cir. 2006).  Administration of the Medicaid Act is entrusted to the Secretary of the United States Department of Health and Human Services, who in turn exercises its authority through the Centers for Medicare and Medicaid Services ("CMS").  While states are not required to participate in Medicaid, all of them do. Ark. Dep't of Health & Human Servs. v. Ahlborn, 547 U.S. 268, 275 (2006).  If a state chooses to participate, it must have a "plan for medical assistance" approved by the Secretary of the United States Department of Health and Human Services.  42 U.S.C. § 1396a.  While Congress has afforded states broad flexibility in tailoring the scope and coverage of their Medicaid programs, Alexander v. Choate, 469 U.S. 287, 303 (1985), the Act establishes a number of prerequisites for approval of a state plan by the Secretary.  42 U.S.C. §§ 1396a(a)(1)-(65).  One requirement is that the state plan must "comply with the provisions of section 1396p of this title with respect to liens, adjustments and recoveries of medical assistance correctly paid,[] transfers of assets, and treatment of certain trusts."  42 U.S.C. § 1396a(a)(18) (emphasis added).  Failure to conform with federal laws and regulations may result in a state's loss of federal aid for the Medicaid program.  42 U.S.C. § 1396c.  North Dakota has chosen to participate in the federally-funded Medicaid program which is administered by NDDHS.

Center contends that NDDHS waived its claim through its application process, NDDHS should be estopped from claiming the trust was not compliant, the North Dakota rules and regulations are in direct conflict with federal Medicaid law, and federal law preempts the North Dakota rules and policies relied upon by NDDHS.  NDDHS argues that Center lacks standing, the

complaint fails to allege a violation of a federally-protected right, and that federal law does not preempt state law in this case.

### A. STANDING

"Whether a plaintiff has standing to sue 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" McClain v. Am. Econ. Ins. Co., 424 F.3d 728, 731 (8th Cir. 2005) (quoting Steger v. Franco, Inc., 228 F.3d 889, 892 (8th Cir. 2000)).  Article III, § 2 of the United States Constitution limits the subject matter jurisdiction of federal courts to actual cases and controversies.  "[S]tanding cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record."  FW/PBS, Inc. v. City of Dallas, Tex., 493 U.S. 215, 231 (1990) (internal citations omitted).  In order to satisfy Article III's standing requirements, a plaintiff must show:  "(1) it has suffered an 'injury-in-fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  McClain, 424 F.3d at 731 (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)).  An injury-in-fact is a "direct injury" resulting from the challenged conduct.  Id. (citing Steger, 228 F.3d at 892).  The plaintiff, as "the party who seeks the exercise of jurisdiction in [its] favor," bears the burden of proving each element of standing.  FW/PBS, Inc., 493 U.S. at 231 (internal citations omitted).

NDDHS contends that Center lacks standing because it has not suffered any injury and there is no imminent injury.  Center contends it meets the requirements of a pooled trust under 42 U.S.C.

§ 1396p(d)(4)(C) and suffers a threatened injury resulting from illegal action, namely that the North

Dakota administrative regulations are in direct conflict with federal Medicaid law.

By letter dated February 15, 2008 to Burleigh County, Annette Bendish of NDDHS's Legal

Advisory Unit mistakenly identified Kemmet's age to be 54, went through a brief background of the

Medicaid program, and ultimately determined Center met the requirements under 42 U.S.C. §

1396p(d)(4)(C):

> The trust is established and managed by the Center for Special Needs Trust
> Administration, Inc., a non-profit association which maintains a separate account for
> each beneficiary of the pooled trust.   Mr. Kemmet has been determined to be
> disabled by the Social Security Administration, the account in the trust will be
> established solely for his benefit, and it was funded with Mr. Kemmet's assets.
> When you determine Mr. Kemmet's Medicaid eligibility, do not count the assets in
> the trust as available, and do not count the transfer of the assets to the trust as a
> disqualifying transfer.

See Docket No. 12-3.

Chapter 75-02-02.1 is North Dakota's administrative regulation regarding Medicaid

eligibility.   Center contends that subsections 75-02-02.1-31.1(4)(b) and (8)(f) add additional

requirements not authorized by Congress which serve as an obstacle to the accomplishment of the

purposes and objectives of federal Medicaid law.   Section 75-02-02.1-31.1 states, in part:

> 4. This section shall not apply to:

> . . . .

>> b.   A trust containing the assets of a disabled individual that meets the
>> following conditions:

>>> (1) The trust is established and managed by a _qualified_ nonprofit
>>> association that acts as trustee;

>>> (2) A separate account is maintained for each beneficiary of the trust,
>>> but, for purposes of investment and management of funds, the trust
>>> pools these accounts;

(3) Accounts in the trust are established solely for the benefit of a disabled individual by the parent, grandparent, or legal guardian of the individual, by the individual, or by a court; and

(4) To the extent that amounts remaining in the beneficiary's account upon the death of the beneficiary are not retained by the trust, the trust pays to the department from such remaining amounts in the account an amount equal to the total amount of medicaid benefits paid under North Dakota Century Code chapter 50-24.1 on behalf of the beneficiary.

. . . .

8.  A nonprofit association is qualified to establish and manage a trust described in subdivision b of subsection 4 only if the nonprofit corporation:

. . . .

f.  Retains funds from a deceased beneficiary's account only if:

(1) The retained funds are to compensate the trust for services rendered;

(2) The account is that of a beneficiary who was a disabled individual who did not receive benefits under this chapter; or

(3) The account does not contain the assets of a disabled individual.

N.D. Amin. Code §§ 75-02-02.1-31.1(4)(b) and (8)(f) (emphasis added).

On October 23, 2008, Special Assistant Attorney General Jonathan Alm, on behalf of

NDDHS, sent Center a letter stating in part:

In accordance with 42 U.S.C. § 1396p(d)(4)(C), N.D. Amin. Code §[§] 75-02-02.1-31.1(4)(b)(4) and (8)(f), Article 6 of the Declaration of Trust, and Article III of the National Pooled Trust Joined Agreement, [NDDHS] submits this request for reimbursement to the state of North Dakota for government assistance provided on behalf of Mr. Kemmet.

The state of North Dakota has provided $40,372.73 in government assistance to Mr. Kemmet.   N.D. Admin. Code § 75-02-02.1-31.1(4)(b)(4) requires the trust administrator "to the extent that amounts remaining in the beneficiary's account upon the death of the beneficiary are not retained by the trust, the trust pays to the

10

> department from such remaining amounts in the account an amount equal to the total amount of medicaid benefits paid under the North Dakota Century Code chapter 50-24.1 on behalf of the beneficiary." In addition, a pooled trust can "retain funds from a deceased beneficiary's account only if: (1) The retained funds are to compensate the trust for services rendered; (2) The account is that of a beneficiary who was a disabled individual who did not receive benefits under this chapter; or (3) The account does not contain the assets of a disabled individual." N.D. Admin. Code § 75-02-02.1-31.1(8)(f). Therefore, the National Pooled Trust cannot retain the assets of Mr. Kemmet and must reimburse the state of North Dakota the amount of services provided to him. . . .

See Docket No. 12-4. Several letters between NDDHS and Center followed. On June 30, 2009, NDDHS sent Center a letter indicating, for the first time, that "[t]he conduct of Mr. Kemmet and those who assisted him in the improper acquisition of Medicaid benefits resulted not only in a disqualifying transfer, but in a transfer in fraud on creditors under N.D.C.C. ch. 13-02.1, the Uniform Fraudulent Transfer Act, along with other civil liability, and perhaps criminal liability." See Docket No. 12-7, p. 2. Center contends that NDDHS "did not explicitly withdraw the demand for reimbursement" based on N.D. Admin. Code §§ 75-02-02.1-31.1(4)(b) and (8)(f). However, in its reply brief, NDDHS explicitly withdraws "[a]ny request for payment as stated in Alm's letters [Docket Nos. 12-4 and 12-5] based on N.D. Admin. Code §§ 75-02-02.1-31.1(4)(b) and (8)(f)" and waives in this case "any future rights to proceed on those code sections." See Docket No. 16, p. 8.

Center contends that even if NDDHS withdrew its request for payment under N.D. Admin. Code §§ 75-02-02.1-31.1(4)(b) and (8)(f), this case falls within the exception to the mootness doctrine for cases that are capable of repetition, yet evading review, thus keeping this a live case and controversy. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." City of Mesquite, Tex. v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982). The standard for "determining whether a case has been mooted by the defendant's voluntary conduct is stringent: 'A case might become

11

moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" <u>Friends of the Earth</u>, 528 U.S. at 189 (citing <u>United States v. Concentrated Phosphate Export Ass'n</u>, 393 U.S. 199, 203 (1968)).  The party asserting mootness bears the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again."  <u>Id.</u> (internal citations omitted).  However, "if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the [plaintiff] to a federal judicial forum."  <u>Id.</u> at 191.

The Court finds that Center had standing at the time the action commenced, and that NDDHS has failed to meet its heavy burden of demonstrating that it will not seek reimbursement from Center in the future under N.D. Admin. Code §§ 75-02-02.1-31.1(4)(b) and (8)(f).  If Center seeks to retain the assets of a future grantor/beneficiary in North Dakota under the National Pooled Trust, NDDHS will likely either determine the Medicaid applicant ineligible because of a transfer to Center or seek reimbursement pursuant to state regulations that are in conflict with the federal Medicaid program. While NDDHS noted in a reply brief that it explicitly waived any right to proceed on those regulations in this particular case, it did not waive that right in future cases.  With the added requirements found in N.D. Admin. Code §§ 75-02-02.1-31.1(4)(b) and (8)(f), individuals applying for Medicaid in North Dakota may also be deterred from transferring their funds to Center.  The Court finds that Center has standing in this case.

## B.     <u>AGE REQUIREMENT</u>

NDDHS contends that it is irrelevant whether the trust conformed to N.D. Admin. Code § 75-02-02.1-31.1 because Kemmet was more than 64-years old and no coverage was available for nursing facility care under 42 U.S.C. § 1396p(c) and N.D. Admin. Code § 75-02-02.1-33.2.

While 42 U.S.C. § 1396p(d)(4)(C) makes no mention of an age requirement, CMS issued a letter in July 2008 "to provide clarification on the application of transfer of assets penalty provision[]s for individuals age 65 and older who have established pool trusts." <u>See</u> Docket No. 12-11, p. 7.  The letter states, in part:

> A pooled trust is a trust that can be established for a disabled individual under the authority of section 1917(d)(4)(C) [, as amended, 42 U.S.C. § 1396p(d)(4)(C),] of the Social Security Act (the Act).  A trust that meets the requirements of this section of the statute is exempt from being treated under the normal Medicaid trust rules in section [1396p](d) of the Act.  A pooled trust is run by a non-profit organization. The trust (or more accurately, a sub-account within the trust) is established for each individual beneficiary.  All the beneficiary sub-accounts are pooled for investments and management purposes.  Upon the death of the disabled individual, the balance remaining in the account is paid back to the State Medicaid agency in the amount equal to the medical assistance paid on behalf of the beneficiary.  <u>The statute also allows the trust to retain some portion of the balance remaining after the death of the beneficiary.</u>

> Although a pooled trust may be established for beneficiaries of any age, funds placed in a pooled trust established for an individual age 65 or older may be subject to penalty as a transfer of assets for less tha[n] fair market value.  When a person places funds in a trust, the person gives up ownership of those funds.  Since the individual generally does not receive anything of comparable value in return, placing funds in a trust is usually a transfer for less tha[n] fair market value.  The statute does provide an exception to imposing a transfer penalty for funds that are placed in a trust established for a disabled individual.  However, <u>only trusts established for disabled individuals age 64 or younger are exempt from application of the transfer of assets penalty provisions</u> (see section [1396p](c)(2)(B)(iv) of the Act).

> <u>If States are allowing individuals age 65 or older to establish pooled trusts without applying the transfer of assets provisions, they are not in compliance with the statute.</u> As explained above, federal statute requires the application of the transfer rules in this situation: it is not a decision for each State to make.

See Docket No. 12-11, p. 7 (emphases added).

Courts "must give substantial deference to an agency's interpretation of its own regulations." Iowa Dep't of Human Servs. v. Ctrs. for Medicare & Medicaid Servs., 576 F.3d 885, 888 (8th Cir. 2009) (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)). The court's "task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." Id. (quoting Shalala, 512 U.S. at 512). "This broad deference is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program." Id. (quoting Shalala, 512 U.S. at 512).

The Court finds that CMS's interpretation is neither plainly erroneous nor inconsistent with the Medicaid Act. It is undisputed that Kemmet was age 65 or older at the time he transferred money into the pooled trust. Under CMS's interpretation, Kemmet's transfer of assets to the pooled trust was not exempt from application of the transfer of assets penalty provisions. While Kemmet's transfer of assets was not exempt, Center still has standing because NDDHS failed to demonstrate it will not seek reimbursement from Center in the future under N.D. Admin. Code §§ 75-02-02.1-31.1(4)(b) and (8)(f) regarding grantors/beneficiaries age 64 or younger.

### C.   UNTIMELY RESPONSE

NDDHS contends that Center did not file a timely response to NDDHS's motion for summary judgment. On February 4, 2010, a scheduling conference was held and the Court approved the scheduling/discovery plan. See Docket No. 9. It outlined that NDDHS will file a motion for summary judgment within 60 days of the scheduling conference and Center will file a response

memorandum/cross motion for summary judgment within 30 days of service of NDDHS's motion. On April 5, 2010, NDDHS filed its motion for summary judgment.  <u>See</u> Docket No. 10.  Center filed its motion for summary judgment and a response memorandum on May 4, 2010.  <u>See</u> Docket Nos. 13 and 14.  The Court finds that Center's response memorandum and motion for summary judgment were timely filed.

### D.   <u>WAIVER</u>

Center also argues that NDDHS waived its claim that the trust was not compliant with the North Dakota Administrative Code through its application process and that NDDHS should be estopped from making such a claim.  Bendish's letter to Burleigh County only references 42 U.S.C. § 1396p(d)(4)(C) and states that the trust established by Center meets those requirements.  <u>See</u> Docket No. 12-3.  Burleigh County then determined that Kemmet was eligible to receive Medicaid. Center argues that Bendish's error regarding Kemmet's age is irrelevant and requests that the Court enter a preliminary and permanent injunction to prevent NDDHS from making future similar demands against Center.

Under North Dakota law, waiver is "the voluntary and intentional relinquishment and abandonment of a known existing right, advantage, benefit, claim, or privilege which, except for [the] waiver, the party would have enjoyed." <u>Runck v. Kutmus</u>, 997 F.2d 399, 400 (8th Cir. 1993) (quoting <u>Brunsoman v. Scarlett</u>, 465 N.W.2d 162, 168 (N.D. 1991)).  "A person may waive the rights and privileges to which that person is legally entitled, whether secured by contract, conferred by statute, or guaranteed by the constitution."  <u>Lawrence v. Delkamp</u>, 2006 ND 257, ¶ 8, 725 N.W.2d 211 (citing <u>Toni v. Toni</u>, 2001 ND 193, ¶ 10, 636 N.W.2d 396).  "Anyone may waive the

advantage of a law intended solely for that person's benefit, but a law established for a public reason cannot be contravened by a private agreement." N.D.C.C. § 31-11-05(4). "A waiver can be made expressly or by conduct." Tormaschy v. Tormaschy, 559 N.W.2d 813, 817 (N.D. 1997). "When parties conduct themselves in a manner which clearly constitutes a waiver, they cannot later claim they did not know their actions amounted to a voluntary and intentional waiver of their rights, because one who consents to an act is not wronged by it." Lawrence, 2006 ND 257, ¶ 8, 725 N.W.2d 211 (quoting Gale v. N.D. Bd. of Podiatric Med., 2001 ND 141, ¶ 14, 632 N.W.2d 424).

NDDHS contends there is no evidence that its attorney (Bendish) knew the retainage terms of the trust conflicted with the North Dakota Administrative Code. However, it is a common rule that "ignorance of the law is not a defense" and "that everyone is presumed to know the law, whether civil or criminal, or, at least, to have acquainted themselves with those laws that are likely to affect their usual activities." 29 Am. Jur. 2d Evidence § 290 (2010); see also Berg v. Hogan, 322 N.W.2d 448, 453 (N.D. 1982) (In determining whether a plaintiff waives the right to rescind a contract, "[t]he party, in effect, has a two-fold responsibility to find out what the facts actually are and then find out what legal rights result from those facts, if the party is not aware of the resulting legal rights. Failure to do so will be construed against the party.").

While a party cannot claim ignorance of the law as a defense to waiver, a state does have the right to redetermine a recipient's Medicaid eligibility. A Wisconsin state appellate court found that the state department in charge of Medicaid "did not waive its right to make a determination of ineligibility due to divestment of assets" and held that "[t]he Department has an ongoing duty to ensure that a [Medicaid] recipient is eligible and the recipient bears the ongoing burden of proving eligibility." Estate of Gonwa v. Wis. Dep't of Health & Family Servs., 668 N.W.2d 122, 128 (Wis.

App. 2003).  An initial determination of eligibility does not preclude a later redetermination of that status.  Id.

The Court finds, as a matter of law, that NDDHS did not waive a potential future claim that the pooled trust is non-compliant with the North Dakota Administrative Code.  Merely failing to cite those regulations in its initial determination does not prevent NDDHS from later redetermining Medicaid eligibility under the applicable state regulations.

Center contends that if NDDHS found Kemmet ineligible, he would have had a right to appeal that decision.  N.D. Admin. Code ch. 75-01-03; 42 C.F.R. § 431.152.  Center argues that waiting until Kemmet's death to determine he was ineligible for Medicaid took the right to appeal away and also constitutes a waiver by NDDHS.  In Case No. 1:09-cv-077, NDDHS contends, "It is now too late to apply the remedy of determining Kemmet to be ineligible, leaving North Dakota no recourse but the State law claims that it asserts in this action."[3]  See Case No. 1:09-cv-077, Docket No. 9.  Since NDDHS is no longer applying the remedy of determining Kemmet to be ineligible, the Court need not entertain this issue.


E.      **EQUITABLE ESTOPPEL**

Center contends that NDDHS should be estopped from claiming the trust was improper because NDDHS's approval of the trust, through Bendish, induced Kemmet to believe that the

---

[3] The complaint in Case No. 1:09-cv-077 contains two claims: (1)  creditor's claim under N.D.C.C. ch. 13-02.1, the Uniform Fraudulent Transfer Act, against Center; and (2) wrongful conversion under N.D.C.C. § 32-03-23 against Center and Huettl.  As previously noted, this case arose out of an innocent mistake by an employee in the Legal Department at NDDHS back in 2008.  Claims of fraud, misrepresentation, or wrongful conversion are extremely far-fetched in light of the undisputed facts set forth in the record.

residual amounts after his death could be retained for charitable purposes and that he was eligible

for Medicaid upon which Kemmet relied.  NDDHS contends that estoppel cannot be maintained.

Section 31-11-06 of the North Dakota Century Code authorizes estoppel:  "When a party,

by the party's own declaration, act, or omission, intentionally and deliberately has led another to

believe a particular thing true and to act upon such belief, that party shall not be permitted to falsify

it in any litigation arising out of such declaration, act, or omission."  To prove a claim of equitable

estoppel under North Dakota law, the plaintiff must show:

> (1) the defendant falsely represented or concealed material facts, or calculated to
> convey the impression that the facts are otherwise than those which the defendant
> attempted to assert; (2) the defendant intended, or at least expected, that such
> conduct would be acted upon by, or would influence, the plaintiff; and (3) the
> defendant had knowledge of the real facts.  Tarnavsky v. Tarnavsky, 2003 ND 110,
> ¶ 10, 666 N.W.2d 444.  The plaintiff must also show: (1) he lacked knowledge and
> the means of knowledge of the truth as to the facts in question; (2) he relied, in good
> faith, upon the conduct or statements of the defendant; and (3) he acted or failed to
> act on the basis of his reliance, so as to change his position or status, to his injury,
> detriment, or prejudice.  Id.  Estoppel against the government is available in limited
> circumstances and should be applied "on a case-by-case basis with a careful
> weighing of the inequities that would result if the doctrine is *not* applied versus the
> public interest at stake and the resulting harm to that interest if the doctrine *is*
> applied."  Blocker Drilling Canada, Ltd. v. Conrad, 354 N.W.2d 912, 920 (N.D.
> 1984).

J.P. v. Stark Cnty. Soc. Servs. Bd., 2007 ND 140, ¶ 20, 737 N.W.2d 627 (emphases in original).

"[E]quitable estoppel will not lie against the Government as it lies against private litigants."

Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 419 (1990).  "In addition to proving the

traditional elements of estoppel, the plaintiff must first establish that the government committed

affirmative misconduct."  Rutten v. United States, 299 F.3d 993, 995-96 (8th Cir. 2002) (citing

Wang v. Attorney Gen. of the United States, 823 F.2d 1273, 1276 (8th Cir. 1987)).  The United

States Supreme Court has held that "claims for estoppel cannot be entertained where public money

is at stake." <u>Richmond</u>, 496 U.S. at 427.  In <u>Richmond</u>, the Supreme Court declined to equitably

estop the Government even though a federal employee provided misinformation to the plaintiff on

which the plaintiff relied to his detriment.  <u>Id.</u> at 433-34.  The Supreme Court in <u>Richmond</u> "left

open the possibility that some kind of affirmative misconduct might give rise to estoppel against the

Government." <u>Johnson v. Guhl</u>, 357 F.3d 403, 409 (3d Cir. 2004) (finding the state should not be

estopped from treating community spouse annuity trust assets as countable) (internal citations

omitted).

Bendish mistakenly identified Kemmet's age to be under 65 years and, according to

NDDHS, mistakenly directed Burleigh County not to count the transfer of assets to the trust as a

disqualifying transfer.  NDDHS initially approving the trust does not rise to the level of affirmative

misconduct on the part of NDDHS.  Accordingly, the Court finds, as a matter of law, that estoppel

cannot be maintained.


### F.    42 U.S.C. § 1983

Center contends that the North Dakota rules and regulations are in direct conflict with

federal Medicaid law.  Specifically, Center argues that N.D. Admin. Code §§ 75-02-02.1-31.1(4)(b)

and (8)(f) add requirements not authorized by Congress which serve as an obstacle to the

accomplishment of the purposes and objectives of 42 U.S.C. § 1396p.  NDDHS contends that Center

merely alleged a violation of federal law, but failed to allege a violation of a federally-protected

right as required to obtain relief under 42 U.S.C. § 1983.  Sections 75-02-02.1-31.1(4)(b) and (8)(f)

limit the types of nonprofit associations that may establish and manage a trust in North Dakota and

require the trust reimburse the state all amounts not earned by the trust.

The United States Supreme Court has held that actions may be brought under 42 U.S.C. § 1983 against state actors to enforce rights created by federal statutes or the Constitution. Gonzaga Univ. v. Doe, 536 U.S. 273, 279 (2002). A plaintiff seeking 42 U.S.C. § 1983 redress "must assert the violation of a federal *right*, not merely a violation of federal *law*." Blessing v. Freestone, 520 U.S. 329, 340 (1997) (citing Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 106 (1989)) (emphases in original).

> [The Supreme Court has] traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States.

Id. at 340-41 (internal citations omitted). "If the legislation meets this test, there is a presumption it is enforceable under section 1983." Lankford, 451 F.3d at 508 (citing Blessing, 520 U.S. at 341).


### 1)      CONGRESS INTENDED PROVISION TO BENEFIT PLAINTIFF

The Eighth Circuit Court of Appeals in Lankford discussed the first prong:

> [T]he Supreme Court clarified the first prong, holding that "anything short of an unambiguously conferred right" does not support an individual right of action under section 1983. As section 1983 enforces "rights," as opposed to "benefits" or "interests," the statutory language must clearly evince an intent to individually benefit the plaintiff. Accordingly, the statute must focus on an individual entitlement to the asserted federal right, rather than on the aggregate practices or policies of a regulated entity, like the state.

Lankford, 451 F.3d at 508-09 (internal citations omitted).  The Eighth Circuit found the statutory language in 42 U.S.C. § 1396a(a)(17)[4] "insufficient to evince a congressional intent to create individually-enforceable federal rights."  Id. at 509.

Several federal district courts have held that subsections of 42 U.S.C. § 1396p create a federal right enforceable under 42 U.S.C. § 1983.  See Bernard v. Kan. Health Policy Auth., No. 09-1247-JTM, 2011 WL 768145, at *9-10 (D. Kan. Feb. 28, 2011) (finding that 42 U.S.C. § 1396p(c)(1)(A) is not enforceable through § 1983 but 42 U.S.C. §§ 1396p(c)(2)(B)(i), 1396p(d)(2)(A)(ii), and 1396p(d)(2)(B) meet all prongs of the Blessing test and speak in terms of the individual benefitted instead of directing the state to act or not to act in a certain way); Lewis v. Rendell, 501 F. Supp. 2d 671, 687-88 (E.D. Pa. 2007) (finding that 42 U.S.C. § 1396p(d)(4)(A) creates a federal right enforceable under 42 U.S.C. § 1983); Johnson v. Guhl, 91 F. Supp. 2d 754, 769-70 (D.N.J. 2000) (finding that 42 U.S.C. §§ 1396a(a)(18) and 1396p(c)(2)(D) provide a cause of action under 42 U.S.C. § 1983).

In Bernard, the court found that "Congress intended [42 U.S.C. §§ 1396p(d)(2)(A)(ii) and 1396p(d)(2)(B)] to benefit the plaintiff by providing how an individual's trust assets will be considered by the state."  Bernard, 2011 WL 768145 at *11.  Section 1396p(d)(4)(C) also provides how an individual's trust assets will or will not be considered.

The court in Lewis concluded that 42 U.S.C. § 1396p(d)(4) confers rights enforceable under Section 1983.  Lewis, 501 F. Supp. 2d at 686.  The court held that Section 1396p(d)(4)(A) "refers to the *eligibility* for Medicaid and provides that eligibility will not be affected by the existence of a supplemental needs trust" when certain requirements are met.  Lewis, 501 F. Supp. 2d at 688

---

[4] A state Medicaid plan must "include reasonable standards . . . for determining eligibility for and the extent of medical assistance under this plan."  42 U.S.C. § 1396a(a)(17).

(quoting Sullivan v. Cnty. of Suffolk, N.Y., 1 F. Supp. 2d 186, 190 (E.D.N.Y. 1998)) (emphasis in original).  Section 1396p(d)(4)(C) also refers to Medicaid eligibility and provides that eligibility will not be affected by the existence of a pooled trust when certain conditions are met.

In Johnson, the court found that 42 U.S.C. § 1396a(a)(18) creates a federal right enforceable under Section 1983.  The court found the first prong of the Blessing test was met:

> [Section 1396a(a)(18)] mandates that "[a] State plan for medical assistance must - . . . comply with the provisions of section 1396p of this title with respect to . . . transfers of assets, and treatment of certain trusts. . . ."  First, the specific purpose of this section is to assure state compliance with some federal standard of accounting for trusts and transfers of assets to determine eligibility.  This benefits those who would be eligible for benefits under § 1396p.  Because Plaintiffs contend that they would benefit from the State's compliance with § 1396p, they are part of the intended beneficiaries.

Johnson, 91 F. Supp. 2d at 770.

The Court finds Bernard, Lewis, and Johnson persuasive.[5]  The Court finds that Congress intended 42 U.S.C. § 1396p(d)(4)(C) to benefit individuals by providing how an individual's trust assets will be considered by the state.  Because Center contends that it would benefit from North Dakota's compliance with Section 1396p, it is arguably included as one of the intended beneficiaries.  Lewis, 501 F. Supp. 2d at 688 (finding that the plaintiffs, including The Arc Community Trust of Pennsylvania and The Family Trust, are part of the intended beneficiaries because they contend that they would benefit from the state's compliance with § 1396p); Johnson, 91 F. Supp. 2d at 770.

---

[5] The courts in Bernard, Lewis, and Johnson denied motions to dismiss but did not decide whether the case would meet summary judgment standards.

## 2)     INTERESTS NOT SO VAGUE AND AMORPHOUS

The second prong is whether Center's asserted interests are not so vague and amorphous as to be beyond the competence of the judiciary to enforce.  In <u>Lankford</u>, the Eighth Circuit held that "[t]he only guidance Congress provides in the reasonable-standards provision [42 U.S.C. § 1396a(a)(17) is that the state establish standards consistent with [Medicaid] objectives - an inadequate guidepost for judicial enforcement."  <u>Lankford</u>, 451 F.3d at 509 (internal quotations omitted).  The Eighth Circuit held that Section 1396a(a)(17) "sets forth only broad, general goals, which the states have broad discretion to implement," and as such, a private right of action does not exist under Section 1983 to enforce Medicaid's reasonable-standards provision. <u>Lankford</u>, 451 F.3d at 509.  While the reasonable-standards provision does not meet the "not so vague and amorphous" prong of the <u>Blessing</u> test, the court in <u>Johnson</u> held that "§ 1396a(a)(18) does not strain judicial competence for a court to review whether, and in what manner, certain assets were taken into account when determining an individual's eligibility for benefits."  <u>Johnson</u>, 91 F. Supp. 2d at 770.

Section 1396p(d)(4) states that "[t]his subsection shall not apply to any of the following trusts" and then lists three different types of trusts, including a pooled trust that meets certain conditions.  42 U.S.C. § 1396p(d)(4)(C).  Whether the state plan applies the trust assets that qualify under Section 1396p(d)(4)(C) in determining an individual's eligibility will be readily apparent. Determining whether a state has violated the provision would not strain the judicial competence.

## 3)     STATUTE UNAMBIGUOUSLY IMPOSES BINDING OBLIGATION ON STATES

The third prong under the <u>Blessing</u> test is whether the statute unambiguously imposes a binding obligation on the States.  "In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms."  <u>Blessing</u>, 520 U.S. at 341.  In <u>Hobbs v.</u>

Zenderman, 579 F.3d 1171 (10th Cir. 2009), the Tenth Circuit Court of Appeals held that 42 U.S.C.

§ 1396p(d)(4)(A) is not enforceable through Section 1983 "because it does not 'unambiguously

impose a binding obligation on the State[].'" Hobbs, 579 F.3d at 1179 (quoting Blessing, 520 U.S.

at 341). The Tenth Circuit found that "Congress left the States free to decide whether and under

what conditions to recognize such [§ 1396p(d)(4)] trusts" and that "States '*need not* count [§

1396p(d)(4)] trusts for eligibility purposes, but nevertheless *may* . . . opt to do so.'" Id. at 1180

(quoting Keith v. Rizzuto, 212 F.3d 1190, 1193 (10th Cir. 2000)) (emphases and alterations in

original).

Other courts have found language similar to that in 42 U.S.C. § 1396p(d)(4)(C) to

unambiguously impose a binding obligation on the state. In Bernard, the court found that 42 U.S.C.

§§1396p(c)(2)(B)(i), 1396p(d)(2)(A)(ii), and 1396p(d)(2)(B)[6] unambiguously impose a binding

obligation on the states because the words "shall not" and "shall" make it clear that the states have

---

[6] Taking into account certain transfers of assets . . .

(c) Taking into account certain transfers of assets . . .

(2) An individual shall not be ineligible for medical assistance by reason of paragraph (1) to the extent that -- . . . (B) the assets -- (i) were transferred to the individual's spouse or to another for the sole benefit of the individual's spouse, . . .

(d) Treatment of trust amounts . . .

(2)(A) For purposes of this subsection, an individual shall be considered to have established a trust if assets of the individual were used to form all or part of the corpus of the trust and if any of the following individuals established such trust other than by will: . . . (ii) The individual's spouse. . . .

(B) In the case of a trust the corpus of which includes assets of an individual (as determined under subparagraph (A)) and assets of any other person or persons, the provisions of this subsection shall apply to the portion of the trust attributable to the assets of the individual.

42 U.S.C. §§ 1396p(c)(2)(B)(i), (d)(2)(A)(ii), (d)(2)(B) (emphases added).

a mandatory obligation.  <u>Bernard</u>, 2011 WL 768145 at *10-11.[7]  The court distinguished sections 1396p(c)(2)(B)(i), 1396p(d)(2)(A)(ii), and 1396p(d)(2)(B) from Supreme Court cases which failed this third prong.  <u>See</u> <u>Suter v. Artist M.</u>, 503 U.S. 347, 358 (1992) (finding that the Adoption Assistance and Child Welfare Act which required states receiving funds for adoption to have a "plan" and to make "reasonable efforts" to keep children out of foster care did not meet the third prong of the <u>Blessing</u> test); <u>Blessing</u>, 520 U.S. at 342-47 (finding that a provision of the Social Security Act requiring states receiving federal child-welfare funds to "substantially comply" with certain requirements lacked the type of mandatory language necessary to support a private cause of action under § 1983); <u>Gonzaga</u>, 536 U.S. at 288 (finding the provisions of the Family Educational Rights and Privacy Act which required states to "comply substantially" with federal regulations failed to unambiguously impose a binding obligation on the states).

42 U.S.C. § 1396a states, "A State plan for medical assistance <u>must</u> -- . . . comply with the provisions of section 1396p of this title with respect to liens, adjustments and recoveries of medical assistance correctly paid,[] transfers of assets, and treatment of certain trusts."  42 U.S.C. § 1396a(a)(18) (emphasis added).  Section 1396p(d)(4) states that "[t]his subsection <u>shall not</u> apply to any of the following trusts" and then lists three different types of trusts, including a pooled trust that meets certain conditions.  42 U.S.C. § 1396p(d)(4)(C) (emphasis added).  The Court finds, as a matter of law, that 42 U.S.C. § 1396p(d)(4)(C), along with Section 1396a(a)(18), unambiguously impose a binding obligation on NDDHS.

---

[7] While <u>Bernard</u> is a district court decision out of the Tenth Circuit, the district court did not discuss why the Tenth Circuit Court of Appeals in <u>Hobbs</u> found that 42 U.S.C. § 1396p(d)(4)(A) did not unambiguously impose a binding obligation on states even though the provision uses "shall not" language.  Instead, the court in <u>Bernard</u> held, "Even though the Tenth Circuit, in <u>Hobbs</u>, held that three provisions of Title XIX - § 1396p(d)(4)(A) and §§ 1396a(a)(10)(C)(i), (a)(17) - did not create private causes of action enforceable under § 1983, it did not foreclose that possibility for other Title XIX provisions."  <u>Bernard</u>, 2011 WL 768145, at *12 (citing <u>Hobbs</u>, 579 F.3d at 1181).

**4)**     **PRESUMPTION CAN BE REBUTTED**

While there is a presumption the legislation is enforceable under 42 U.S.C. § 1983 if it meets the <u>Blessing</u> test, that does not end the Court's inquiry.  "The presumption is rebutted if Congress explicitly or implicitly forecloses section 1983 enforcement.  The availability of administrative remedies alone, however, cannot defeat the plaintiff's ability to invoke section 1983, so long as the other requirements of the three-part test are met."   <u>Lankford</u>, 451 F.3d at 508 (internal citations omitted).  In <u>Ark. Med. Soc'y, Inc. v. Reynolds</u>, 6 F.3d 519, 528 (8th Cir. 1993), the Eighth Circuit Court of Appeals, relying on the Supreme Court's decision in <u>Wilder v. Va. Hosp. Ass'n</u>, 496 U.S. 498, 520-23 (1990), held that Congress has not foreclosed Section 1983 enforcement in the Medicaid statute.

In <u>Harris v. Olszewski</u>, 442 F.3d 456 (6th Cir. 2006), the Sixth Circuit Court of Appeals held that other provisions of the Medicaid Act do not explicitly or implicitly foreclose the private enforcement of 42 U.S.C. § 1396a(a)(23)[8] through Section 1983 actions.  <u>Harris</u>, 442 F.3d at 462. The Sixth Circuit found that "[t]he Medicaid Act does not provide other methods for private enforcement of the Act in federal court" and "[t]hat the Federal Government may withhold federal funds to non-complying States is not inconsistent with private enforcement."  <u>Id.</u> at 462-63.  The Sixth Circuit further held that "the Act's requirement that States 'grant[] an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the [State] plan is denied,' 42 U.S.C. § 1396a(a)(3)," is also not "inconsistent with a private action under § 1983."  <u>Id.</u> at 463 (citing <u>Wilder</u>, 496 U.S. at 520-22).

_____

[8] "A State plan for medical assistance must . . . provide that [] any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . ."  42 U.S.C. § 1396a(a)(23).

26

The Court finds, as a matter of law, that Congress does not explicitly or implicitly foreclose Section 1983 enforcement in this case. All three prongs of the <u>Blessing</u> test are met, creating a presumption that 42 U.S.C. § 1396p(d)(4)(C) is enforceable under 42 U.S.C. § 1983, and the presumption is not rebutted.

While a cause of action under 42 U.S.C. § 1983 may exist for violation of 42 U.S.C. § 1396p(d)(4)(C), Center's claim is without merit. As noted above, under CMS's interpretation, Kemmet's transfer of assets to the pooled trust was not exempt from application of the transfer of assets penalty provisions because he was age 65 or older at the time he transferred money into the pooled trust. As such, Kemmet's transfer of assets did not qualify under 42 U.S.C. § 1396p(d)(4)(C). Summary judgment is warranted under the circumstances.

### G.   SUPREMACY CLAUSE

Center also contends that Sections 75-02-02.1-31.1(4)(b) and (8)(f) of the North Dakota Administrative Code are preempted by the Supremacy Clause because they are in direct conflict with the Medicaid Act. Center contends that 42 U.S.C. § 1396p(d)(4)(C) creates a federal policy mandating that nonprofit organizations may keep the excess funds from the national pooled trust instead of reimbursing the state. Any further requirement engrafted by the state, according to Center, impermissibly interferes with the statutory intent of the Medicaid program and is unenforceable.

There are limited situations where state law is preempted by federal law. See <u>Fletcher v. Burlington N. & Santa Fe Ry. Co.</u>, 474 F.3d 1121, 1126 (8th Cir. 2007). The Court concludes that this case does not directly involve the Department of Human Services' application of the

administrative rules cited above and whether such rules are in direct conflict with federal laws pertaining to pooled trusts. The presumption against federal preemption leads the Court to conclude, as a matter of law, that the argument for preemption is without merit.

### H.    COSTS AND ATTORNEY FEES

Center has requested costs and attorney's fees pursuant to 42 U.S.C. § 1988. "[T]he court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs" in any action or proceeding to enforce a provision of 42 U.S.C. § 1983. 42 U.S.C. § 1988(b). "Though the Eleventh Amendment bars an award of damages against a State in a § 1983 action, a federal court may award attorneys' fees and other costs against the State under § 1988 as part of the prospective injunctive relief authorized in the landmark decision Ex parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)." El-Tabech v. Clarke, 616 F.3d 834, 837 (8th Cir. 2010). As noted above, the Court finds that Center's 42 U.S.C. § 1983 claim is without merit because, among other things, Kemmet's transfer of assets did not qualify under 42 U.S.C. § 1396p(d)(4)(C) due to his age. The Court, in its discretion, denies Center's request for an award of costs and attorney's fees.

In addition, the Court, in its discretion, would deny any request for costs and attorney's fees on behalf of the Defendant. The Court notes that this litigation is essentially a simple collection dispute over $19,234.58. The costs and attorney's fees incurred by both parties to date in the state and federal court actions far exceed this paltry sum. The parties have been embroiled in needless and endless bickering and litigation in state and federal court since 2009 - over the sum of $19,000. Claims of fraud, wrongful conversion, civil rights violations, and a litany of other horribles have

28

been asserted by both parties.  The insanity associated with the pursuit of litigation in state and federal court - over merely $19,000 - boggles the mind of any reasonable person.  Reasonable persons could have, and should have, settled this $19,000 collection dispute long before it ever reached the state <u>and</u> federal courts of this district.  Hopefully, common sense will prevail in the days ahead.

### III.   <u>CONCLUSION</u>

The Defendant's motion for summary judgment (Docket no. 10) is **GRANTED IN PART AND DENIED IN PART** and the Plaintiff's motion for summary judgment (Docket No. 13) is **GRANTED IN PART AND DENIED IN PART**.

The Court finds as a matter of law the following:

1) Center for Special Needs Trust Administration, Inc. has standing;

2) Kemmet's transfer of assets to the pooled trust was not exempt from application of the transfer of assets penalty provision;

3) Center's response memorandum and motion for summary judgment were timely filed;

4) NDDHS did not waive its claim;

5) Estoppel cannot be maintained;

6) 42 U.S.C. § 1396p(d)(4)(C), along with 42 U.S.C. § 1396a(a)(18), create federal rights enforceable under 42 U.S.C. § 1983.  However, Center's claim under 42 U.S.C. § 1983 is without merit;

7) Neither party is entitled to an award of costs or attorney's fees; and

8) The case is dismissed.

**IT IS SO ORDERED**.

Dated this 25th day of April, 2011.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court